Sheldon E. ADAMS, et al.

v.

BUFFALO FORGE COMPANY.

Supreme Judicial Court of Maine.

Argued Nov. 10, 1981.

Decided April 5, 1982.

McTeague, Higbee & Tucker, Maurice A. Libner (orally), Brunswick, for plaintiffs.

Verrill & Dana, James G. Goggin (orally), John W. Philbrick, Portland, for defendant.

Before McKUSICK, C. J., and GOD-FREY, NICHOLS, ROBERTS, CARTER, VIOLETTE and WATHEN, JJ.

ROBERTS, Justice.

Sheldon and Lisa Adams appeal from a summary judgment in favor of the defendant Buffalo Forge Company entered in Superior Court, Sagadahoc County. The plaintiffs contend that the Superior Court erred when it applied Maine law rather than the law of New York or Massachusetts. In the alternative, they urge us to reexamine the requirement of privity in products liability actions and, further, to here apply Maine's strict liability statute, 14 M.R.S.A. § 221. We vacate the judgment of the Superior Court and remand this case for further proceedings consistent with this opinion.

The facts are not in dispute. The defendant is a New York manufacturer of industrial equipment. In 1966 Bath Iron Works, the plaintiff's employer, ordered a drill press from Chandler & Farquhar Company, an independent Massachusetts dealer of the defendant's equipment. In early 1967 Chandler & Farquhar purchased the machine from the defendant and requested the defendant ship it directly to Bath Iron Works. In February 1967 the defendant shipped the machine to Bath Iron Works. On June 13, 1979, Sheldon Adams was injured by the drill press while at work. He has alleged that as he was attempting to change drill bits his arm came into contact with a power switch on the front of the machine which caused the machine to turn on, resulting in injury to him.

Plaintiffs filed suit against the defendant in February 1980. In Count One Sheldon Adams alleges that his injuries were proximately caused by an unreasonably dangerous and defective condition of the defendant's drill press which allowed the drill press to turn on while he was attempting to change bits. Count Two alleges that the defendant was negligent in the manufacture of the drill press. In Count Three, Lisa Adams, the wife of Sheldon Adams, alleges damages resulting from loss of consortium, mental anguish and nursing care and services she provided following the injury.

■ The Superior Court, following a motion for summary judgment brought by the defendant, entered judgment in favor of defendant and against plaintiffs.[1]

1. The defendant's motion for summary judgment states only that the defendant is entitled to judgment as a matter of law. No grounds for this alleged entitlement are given. We disapprove of such a procedure. Parties moving for summary judgment or dismissal should recognize that the motion, if granted, may well result in appellate review. In such a case counsel should ensure that the *record* gives the appellate court at least some clue as to what issues it must confront. *See Eich v. Gellerson*, Me., 441 A.2d 315, 317 (1982).

The parties here, however, submitted pretrial memoranda as required by M.R.Civ.P. 16 and the Superior Court issued a pretrial order. The pretrial order supersedes the pleadings and formulates the issues to be tried. *Cyr v. Cote*, Me., 396 A.2d 1013, 1016 (1979). Later, the defendant moved the Court to amend its pretrial memorandum to include as one of the "unusual legal issues" presented:

The ability of the Plaintiffs to recover in negligence or strict liability in a case where the machine in question was sold prior to, but the injury occurred after, the effective

### I. *Choice of Law*

On appeal the plaintiffs have raised three arguments. Plaintiffs initially contend that the Superior Court erred when it applied the law of Maine rather than the law of New York, the place of manufacture, or the law of Massachusetts, the situs of the dealer, when it dismissed the plaintiffs' negligence claim. We do not agree.

Plaintiffs, being fully cognizant of our recent opinions in *Burke v. Hamilton Beach Division*, Me., 424 A.2d 145 (1981) and *Hurd v. Hurd*, Me., 423 A.2d 960 (1981), wherein we decided that lack of privity constituted a bar to recovery for product liability negligence claims, have argued that Maine's only interest in this case, if it has any interest at all, is in ensuring that Maine's citizens are compensated for injuries caused by defective, negligently manufactured machinery. According to the plaintiffs, Maine's policy interest is here best served by applying the law of New York or Massachusetts, which do not require privity as a prerequisite to recovery, rather than applying the "moribund" doctrine announced in *Burke* or *Hurd*.

■ Plaintiffs have correctly noted that we have heretofore abandoned the rigid *lex loci delicti* choice of law rule. *Beaulieu v. Beaulieu*, Me., 265 A.2d 610 (1970). In *Beaulieu* this Court was confronted with a choice of law issue between the applicability of the Massachusetts automobile host-passenger rule requiring a showing of gross negligence on the defendant-host's part as a prerequisite to recovery by the plaintiff-passenger and Maine law which did not distinguish degrees of negligence on the part of a defendant driver. *Id.* at 611–12. In *Beaulieu* we cited favorably the approach of the *Restatement (Second) of Conflict of Laws* § 379, comment d, p. 9 (Tent. Draft No. 9) (1964) which implemented the use of the more flexible "most significant contacts and relationships" test. 265 A.2d at 616–17. Since our decision in *Beaulieu* the official draft of the *Restatement (Second) of Conflict of Laws* (1971) has been approved and published by the American Law Institute. Sections 145 and 146 of the *Restatement (Second)* continue to advocate the "most significant contacts and relationships" test promulgated ·by the earlier drafts.[2] Section 146 now provides that "[i]n an action for a personal injury, the local law of the state where the injury occurred determines the rights and liabilities of the parties, *unless*, with respect to the particular issue, some other state has a more significant relationship . . . to the occurrence and the parties. . . ." *Restatement (Second) of Conflict of Laws* § 146 (1971) (emphasis added). We think the more flexible approach of the Restatement §§ 145 & 146 should apply to personal injury actions sounding in tort and involving products liability as well as those actions which involve automobile negligence.

■ Though not dispositive of the issue, it is not denied that the injury here did, in fact, occur in Maine. Moreover, this is not a case in which the *only* connection is the fortuitous fact that the injury was sustained in Maine. In addition to being the place of injury, Maine is the location to

---

date of the strict liability statute and the abrogation of the requirement for privity between manufacturer and user. *See* M.R.Civ.P. 16(3)(I) & 16(4). The Court granted the motion to amend, apparently without objection. We accordingly consider the privity issue as incorporated into the Superior Court's pretrial order and find the issue properly before us.

2. Section 145 enunciates the "general principle" as follows:

(1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.

(2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

(a) the place where the injury occurred,

(b) the place where the conduct causing the injury occurred,

(c) the domicil, residence, nationality, place of the parties, and

(d) the place where the relationship, if any, between the parties is centered.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

which the defendant-manufacturer directly shipped the product. Maine is the state in which the product was put to its intended use. The buyer of the product and the employer of Sheldon Adams is sited in Maine. Both plaintiffs, Sheldon and Lisa Adams, are residents of Maine. Suit was brought in the courts of Maine. Reviewing these factors in the light of the contacts and relationships test enunciated above we conclude that the law of Maine must govern the case at bar. Since we find it appropriate to apply the law of Maine, we also conclude that the case at bar does, in fact, compel a reexamination of our decisions in *Burke v. Hamilton Beach Division* and *Hurd v. Hurd.*

## II. *Stare Decisis*

Before we reexamine the opinions expressed in *Burke* and *Hurd,* we must first confront the effect of the doctrine of stare decisis. The underlying rationale of the doctrine of stare decisis is the obvious need to promote consistency and uniformity of decisions. *See Hertz v. Woodman,* 218 U.S. 205, 212, 30 S.Ct. 621, 622, 54 L.Ed. 1001, 1009 (1910). The doctrine has been said to serve as "a brake upon legal change to be applied in the interests of continuity." *Amoskeag Trust Co. v. Trustees of Dartmouth College,* 89 N.H. 471, 474, 200 A. 786, 788 (1938). While we recognize the unquestioned need for the uniformity and certainty the doctrine provides, we have also previously recognized the dangers of a blind application of the doctrine merely to enshrine forever earlier decisions of this court. *See Beaulieu v. Beaulieu,* Me., 265 A.2d 610, 613 (1970); *e.g., Walker v. Armco Steel Corp.,* 446 U.S. 740, 749, 100 S.Ct. 1978, 1984, 64 L.Ed.2d 659, 667 (1980). When principles fail to produce just results, this Court has found a departure from precedent necessary to fulfill its role of reasoned decision making. *Anderson v. Neal,* Me., 428 A.2d 1189, 1191 (1981); *See Black v. Solmitz,* Me., 409 A.2d 634 (1979); *Davies v. City of Bath,* Me., 364 A.2d 1269 (1976); *Beaulieu,* 265 A.2d 610.

■ Stare decisis embodies the important social policy of continuity in law. *Helvering v. Hallock,* 309 U.S. 106, 119, 60 S.Ct. 444, 451, 84 L.Ed. 604, 612 (1940). The doctrine, however, "is a principle of policy and not a mechanical formula of adherence to the latest decision, however recent and questionable, when such adherence involves collision with a prior doctrine more embracing in its scope, intrinsically sounder, and verified by experience." *Id.* at 119, 60 S.Ct. at 451, 84 L.Ed. at 612. Whether the doctrine should be applied or avoided is a decision which rests in the discretion of the court. *Hertz v. Woodman,* 218 U.S. at 212, 30 S.Ct. at 622, 54 L.Ed. at 1009; *Amoskeag Trust,* 89 N.H. at 474, 200 A. at 788. That discretion must be exercised with a view to whether adherence to past error or departure from precedent constitutes the greater evil to be suffered.

Courts properly seek to create a framework of continuity amidst a universe of continuous change in order that those citizens and litigants who rely upon the legal doctrines and principles they announce may conduct their day-to-day affairs without fear that their reasonable expectations will be torn asunder by an unforeseen and radical departure from precedent. Conversely, "there should be greater readiness to abandon a rule of doubtful adequacy in dispensing exact justice, when the rule to be discarded may not reasonably be supposed to have determined the conduct of litigants." *Beaulieu,* 265 A.2d at 613, *citing* B. Cardozo *The Nature of the Judicial Process* 150–51 (1921). These considerations have resulted in a reluctance on the part of appellate courts to depart from stare decisis when an abandonment of past precedent would interfere with the valid reliance interests of litigants arising from contract rights, real property rights or rights to property by descent.

On the other hand, here we discern no reliance interests which will be unjustifiably infringed upon by our reexamination of *Burke v. Hamilton Beach Division* and *Hurd v. Hurd.* Those cases, we have determined, constituted our first declaration that lack of privity could provide a defense in an

action sounding in tort. Moreover, in this context, we think it significant that our Legislature over twelve years ago resolved the policy considerations presently before us in a manner contrary to the holdings of *Burke* and *Hurd*. *See* P.L.1969, ch. 327. *See also* note 12, *infra*. The reexamination of our judicially announced doctrine will not do violence to a long line of authority, nor will it interfere with the reliance interests of these or other litigants. We conclude, therefore, that a full reexamination of the merits of a rule never formally adopted by this Court prior to *Burke* and *Hurd* and rejected by our Legislature in 1969 is now particularly appropriate.

### III. *The Negligence Claim*

As we noted above, we have determined that prior to the decisions in *Burke* and *Hurd*, this Court had never held that lack of privity constituted a defense in a negligence action sounding in tort. It is true that in *McNally v. Nicholson Manufacturing Co.*, Me., 313 A.2d 913, 923 (1973) we stated by way of dictum that although "a 'strict' liability arising in *tort* should, in principle, have no involvement with 'privity' limitations . . . the *tort* law of products liability developed historically *contrary* to the dictates of sound theory." (Emphasis in original.) We went on to state that "[a]s had happened with the *Pelletier v. DuPont* [124 Me. 269, 128 A. 186 (1925)] pronouncement that 'privity' is essential to 'warranty' products liability, so it fortuitously occurred in Maine that after the *Flaherty v. Helfont* [123 Me. 134, 122 A. 180 (1923)] formulation of 'privity' as an indispensable pre-condition of *tort* products liability . . . no case had come to this Court enabling it to reassess *Flaherty v. Helfont* in the light of progressive developments occurring in the great

majority of other jurisdictions." 313 A.2d at 924 (emphasis in original).

Significantly, in *McNally* this Court did not address Count One of the plaintiff's complaint which alleged negligence on the defendant's part.[3] The only issues then before the Court related to Count Two of the plaintiff's complaint which alleged liability predicated upon breach of warranty and to Count Three of the complaint which alleged liability predicated upon the as yet unrecognized concept of strict liability. The above statements in *McNally* must, of course, be read in the context of the issues which were then before us—that is to say, in terms of whether it was proper for this Court to then adopt an heretofore unrecognized concept of strict liability.

As we also noted in *McNally* "[i]n *tort*, special 'consent', or 'contract', arrangements are not of the essence of, but are rather coincidental to, the origin of duties. In *tort*, obligations are created by virtue of the *status* relationships of persons in society and, therefore, the rationale of their existence is not only independent of consent but also precludes the effectiveness of consensual arrangements purporting to deny or limit the obligations." 313 A.2d at 923 (emphasis in original). We reaffirm this principle. Indeed, it is clear to us that until *Burke* and *Hurd* our cases which addressed this issue since our 1923 decision in *Flaherty v. Helfont*, 123 Me. 134, 122 A. 180, had consistently recognized this salutary doctrine and had refused in tort actions to impose the limitations which had developed to limit consensual obligations.

*Flaherty v. Helfont*, 123 Me. 134, 122 A. 180 (1923), presented this Court with our first opportunity to comment upon the issues presently before us. In *Flaherty* the

---

**3.** The plaintiff in *McNally* initially filed a two count complaint. 313 A.2d at 914. Count One of the complaint alleged negligence on the part of the defendant. *Id.* Count Two alleged breach of warranty. *Id.* Alleging lack of privity, the defendant moved to dismiss only Count Two of the complaint. *Id.* at 915. After the defendant moved to dismiss Count Two, the plaintiff amended the complaint to include a third count alleging a cause of action for strict liability. *Id.* The defendant then moved to

dismiss Count Three on the grounds that it failed to state a claim upon which relief could be granted. *Id.* at 916. On report, pursuant to M.R.Civ.P. 72(c), the case presented this Court only with the propriety of the actions taken by the Superior Court upon the defendant's motions to dismiss Counts Two and Three. The defendant had not moved to dismiss Count One of the complaint which alleged negligence. No issue involving the plaintiff's negligence claim was then before us.

plaintiff brought an action alleging a "'dangerous instrumentality' theory" and two counts of negligence following a collision between a truck and a carriage. *Id.* at 135, 122 A. at 180. We disposed of the dangerous instrumentality theory, not because the plaintiff lacked privity with the defendant, but because even "[a]ssuming that the steering gear was in dangerously defective condition it [was] apparent that such defect was not the cause of the accident." *Id.* at 138–39, 122 A. at 182. *Flaherty* squarely held that the plaintiff could not recover under his dangerous instrumentality theory because he had failed to prove that the alleged defect actually caused the injury-producing accident. *Id.*, 122 A. at 182.[4] The *Flaherty* case, by way of dictum, commented that "[t]he general rule is that no liability attaches for injury to persons who cannot be brought within the scope of the contract." *Id.* at 137, 122 A. at 181 (citations omitted). We also noted, however, that "[i]n case of any such substance whose dangerous qualities are latent and not obvious, manufacturers, vendors or distributors who intentionally or negligently fail to inform persons dealing with them of such qualities ... are, notwithstanding want of privity, liable for injuries caused thereby to persons whose exposure to the danger could reasonably be contemplated." *Id.*, 122 A. at 181 (emphasis added) (citations omitted). Two years later we reaffirmed the dictum of *Flaherty* that lack of privity constituted a valid defense to an action brought in *contract* for an alleged breach of warranty. *Pelletier v. DuPont*, 124 Me. 269, 276, 128 A. 186, 189 (1925). The decision in *Pelletier* turned on the fact the action was brought in *contract.* We again noted, however, that if the cause of action had alleged negligence on the part of the defendant the plaintiff "... might have a right of action whether there was privity or not." *Id.* at 277, 128 A. at 190, *citing Newhall v. Ward Baking Co.*, 240 Mass. 434, 134 N.E. 625 (1922). Later cases prove that we did, in fact, adopt as the law

of Maine *Pelletier's* dictum regarding liability in tort notwithstanding lack of privity without resort to the rubric of "exceptions."

In *Lajoie v. Bilodeau*, 148 Me. 359, 93 A.2d 719 (1953) the plaintiffs sued the defendant manufacturer-bottler after one plaintiff was injured drinking from a bottle of the defendant's "Sunset Ginger Ale" contaminated by an "old dirty brush" and rust. *Id.* at 361, 93 A.2d at 720. The injured plaintiff had purchased the offending product from a retail grocery store. The plaintiffs, although in privity with the retail seller, commenced an action against only the manufacturer-bottler alleging negligence on its part. The plaintiffs were not in privity with the defendant. On appeal, however, we upheld the trial justice's refusal to direct a verdict in favor of the defendant without discussion of the lack of privity between the plaintiffs and the defendant. *Id.* at 364–66, 93 A.2d at 721–22.

Similarly, in *Wallace v. Coca-Cola Bottling Plants, Inc.*, Me., 269 A.2d 117 (1970), a plaintiff commenced an action against the defendant manufacturer-bottler after purchasing the defendant's product, which contained an unpackaged prophylactic, from an intermediate seller. *Id.* at 118. The plaintiff alleged two counts—breach of warranty and negligence. *Id.* The presiding justice allowed the jury to consider only the issue of negligence. *See Pelletier v. DuPont*, 124 Me. at 276, 128 A. at 189. The jury returned a verdict of $2,000 in favor of the plaintiff. We denied the defendant's subsequent appeal and upheld the judgment entered in the Superior Court notwithstanding the fact that the plaintiff and defendant were not in privity with one another. Again, no mention was made of the obvious lack of privity between the parties.

Indeed, only two years *after McNally*, on certification by the United States District Court, in *Williams v. Ford Motor Co.*, Me., 342 A.2d 712, 718 (1975), we held that the statute of limitations did not commence to run upon a claim of alleged negligence

---

4. The Court also denied the plaintiff recovery on the ground that the defendant was not responsible for the alleged negligent acts of the driver of the truck. 123 Me. at 136–37, 122 A. at 180–81.

against a manufacturer until the plaintiff had "a judicially recognizable claim against the defendant." In *Williams* the plaintiff was the brother of the purchaser of the allegedly defective automobile. Significantly, we noted at the outset in *Williams* that "the plaintiff was a stranger to the transaction" (*i.e.,* the purchase of the defective automobile). *Id.* at 713. Notwithstanding the obvious and recognized lack of privity between the plaintiff and the defendant manufacturer, we held that the plaintiff's claim of negligence was not barred by the statute of limitations. *Id.* at 719.

■ In order to avoid further confusion and the potential for unjust results a clear distinction must be drawn, as we suggested in *McNally*, between actions which sound in contract and those which sound in tort. Contractual recovery is predicated in the first instance upon a consensual obligation between two or more parties. *McNally,* 313 A.2d at 923. The common law, recognizing the consensual underpinnings of the contractual relationship, understandably required privity between parties as a condition precedent to recovery for breach of contract. *Id.* at 916–17.[5]

Tort recovery, on the other hand, does not rest upon a consensual relationship between the parties. Certainly the pedestrian hit by a negligently driven automobile need not show that he is in a contractual relationship with the driver as a prerequisite to recovery. Undoubtedly the plaintiff and defendant may be said to be in a "relationship" with each other. It would be a misnomer, however, to term the relationship between the parties a consensual relationship. Rather, in tort, liability is grounded upon the *status* relationship between the parties. *Id.* The status relationship which constitutes the predicate for tort recovery is entirely independent from and, indeed, foreign to any notions of the consensual features which form the basis of contractual liabili-

ty. The *status* relationship is not born of an agreement between the parties but rather is created when the requisite events necessary to support a cause of action in negligence merge—which occurs at "the point at which a wrongful act produces an injury for which a potential plaintiff is entitled to seek judicial vindication." *Williams,* 342 A.2d at 714.

■ Moreover, the events necessary to sustain a cause of action in negligence remain the same today as they were sixty years ago when we decided *Flaherty v. Helfont,* 123 Me. 134, 122 A. 180 (1923): the plaintiff must prove that the defendant owed plaintiff a duty of care, *Wing v. Morse,* Me., 300 A.2d 491, 495–96 (1973); *MacDonald v. Hall,* Me., 244 A.2d 809, 814 (1968); that the defendant breached the duty owing to the plaintiff, *United States v. Schultz,* 282 F.2d 628, 631 (1st Cir. 1960) (applying Maine law), *cert. denied,* 365 U.S. 817, 81 S.Ct. 698, 5 L.Ed.2d 695 (1961); *Wing v. Morse,* 300 A.2d at 495–96; and that the defendant's breach of duty was the actual and legal cause of the injury suffered by the plaintiff. *Id.* at 496; *Johnson v. Dubois,* Me., 256 A.2d 733, 734 (1969); *Marsh v. Great Northern Paper Co.,* 101 Me. 489, 501–02, 64 A. 844, 950 (1906); *see Marshall v. Nugent and Socony-Vacuum Oil Co.,* 222 F.2d 604, 610–12 (1st Cir. 1955). We see little to distinguish a negligence action predicated upon negligence in the manufacture or design of a product from other types of negligence actions well known to the common law.

The recognition that tort obligations arising from status relationships and contract obligations arising from consensual relationships create separate and distinct predicates of liability, and that a negligence action alleging a product defect is virtually indistinguishable from negligence actions well known to the common law, lead us to

---

**5.** Many of the common law prerequisites to recovery in contract have, of course, been altered by legislative fiat. *See* 11 M.R.S.A. § 2–318 (enacted by P.L.1973, ch. 441, § 1); 11 M.R.S.A. § 2–607(7) (enacted by P.L.1973, ch. 443); 11 M.R.S.A. § 2–725(2) (enacted by P.L. 1973, ch. 442); text *infra* at 942–43.

discern no reason, either in logic or, prior to our decisions in *Burke* and *Hurd*, in precedent, to allow lack of privity to be used as a defense to a products liability negligence action. *See Gardner v. Q.H.S., Inc.*, 448 F.2d 238, 242–43 (4th Cir. 1971) (action by apartment house owner against manufacturer of hair rollers purchased by plaintiff's tenant after rollers ignited and burned down plaintiff's building); *Dement v. Olin-Mathieson Chemical Corp.*, 282 F.2d 76, 80–81 (5th Cir. 1960) (action by employee against manufacturer of explosives purchased by employer); *Sylvania Electric Products, Inc. v. Barker*, 228 F.2d 842, 848 (1st Cir. 1955), *cert. denied*, 350 U.S. 988, 76 S.Ct. 475, 100 L.Ed. 854 (1956) (action by widow of employee against employer's supplier); *Haragan v. Union Oil Co.*, 312 F.Supp. 1392, 1394 (D.Alaska 1970) (action by injured employee of purchaser to recover from manufacturer); *General Motors Corp. v. Davis*, 141 Ga.App. 495, 496, 233 S.E.2d 825, 827 (1977) (action against manufacturer of truck which caused accident in which plaintiff's decedent was killed); *Lovejoy v. Minneapolis-Moline Implement Co.*, 248 Minn. 319, 325, 79 N.W.2d 688, 693 (1956) (action by employee of purchaser against manufacturer); *Mickle v. Blackmon*, 252 S.C. 202, 229–35, 166 S.E.2d 173, 185–87 (1969) (action by automobile passenger against manufacturer). *See also Restatement (Second) of Torts* § 395, comments h & i (1965). Comment h to section 395 of the *Restatement (Second) of Torts* notes: "[a] threshing machine sold to the owner of a large farm is obviously intended for the use of his employees." So too, a drill press sold to a large corporation is obviously intended for the use of the employees of that corporation.

The fact that a sale of a negligently manufactured product may have occurred at some time in the past does not compel the application of contract principles to an action which sounds in tort. In negligence "the concept is one of foreseeability, and liability in negligence does not even require that there have been a sale in the first instance." 1 L. Frumer & M. Friedman, *Products Liability* § 5.03[1], at 52 (1981).

■ We hold, therefore, that lack of privity does not constitute a bar to an action alleging negligence on the part of the manufacturer. We overrule *Burke v. Hamilton Beach Division* and *Hurd v. Hurd* to the extent those decisions express opinions contrary to that set forth above.[6]

### IV. The Strict Liability Claim

Maine's strict liability statute, 14 M.R.S.A. § 221 provides:

One who sells any goods or products in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to a person whom the manufacturer, seller or supplier might reasonably have expected to use, consume or be affected by the goods, or to his property, if the seller is engaged in the business of selling such a product and it is expected to and does reach the user or consumer without significant change in the condition in which it is sold. This section applies although the seller has exercised all possible care in the preparation and sale of his product and the user or consumer has not bought the product from or entered into any contractual relation with the seller.

The effective date of Maine's strict liability statute, 14 M.R.S.A. § 221, was October 3, 1973.

The defendant relies upon the fact that the sale of the allegedly defective machinery occurred in either 1966 or 1967 to argue that strict liability does not apply if any operative event—whether that event is the

---

6. We recognize that *Hurd v. Hurd*, which involved an injury to an employee of the buyer, presented us with a factual situation more comparable to the case at bar than was *Burke v.* *Hamilton Beach Division*, which involved an injury to the buyer herself. As the foregoing analysis has shown, any distinction between

sale of the product or the injury—has occurred before October 3, 1973. In support of this contention defendant cites dictum [7] in *Burke v. Hamilton Beach Division* to the effect that "section ... 221 of title 14 [does] not apply to claims where any of the operative events, whether they are sales transactions or tort events, have occurred before the effective dates of the respective statutes." 424 A.2d at 148–49.

The Legislature formulated our strict liability statute, 14 M.R.S.A. § 221, directly from section 402A of the *Restatement (Second) of Torts* (1965). Much of what we have stated above regarding the plaintiff's negligence claim pertains as well to the strict liability claim for, in our view, a cause of action alleging strict liability is one which sounds in *tort*, not contract.

It is true that some courts in the past have described recovery in strict liability as essentially indistinguishable from recovery for breach of warranty.[8] Such a description, however, ignores the fact that strict liability "is not subject to the various contract rules [privity, warranty limitations, notice, disclaimer, etc.] which have grown up to surround ... sales." *Restatement (Second) of Torts* § 402A, comment m (1965).[9] Indeed, this Court recognized this important distinction in *McNally* when we said: "[t]he fundamental difference which can emerge, however, by originating 'strict' products liability on a *tort*, rather than 'warranty', rationale is that the 'consensual-contract' features historically predominant in 'warranty' will not become the fundamental determinants of the nature and scope of the regulatory principles which will

vertical and horizontal privity is no longer significant.

7. The plaintiff in *Burke* had not alleged a cause of action in strict liability and the issue of the applicability of 14 M.R.S.A. § 221 was not then before this Court.

8. *See Dawson v. Chrysler Corp.*, 630 F.2d 950, 955 (3d Cir. 1980), *cert. denied*, 450 U.S. 959, 101 S.Ct. 1418, 67 L.Ed.2d 383 (1981); *Davis v. Wyeth Laboratories, Inc.*, 399 F.2d 121, 126 (9th Cir. 1968); *Neofes v. Robertshaw Controls Co.*, 409 F.Supp. 1376, 1378–79 (D.Ind.1976).

9. In its entirety comment m of the *Restatement (Second) of Torts* § 402A (1965) states:

"*Warranty.*" The liability stated in this Section does not rest upon negligence. It is strict liability, similar in its nature to that covered by Chapters 20 and 21. The basis of liability is purely one of tort.

A number of courts, seeking a theoretical basis for the liability, have resorted to a "warranty," either running with the goods sold, by analogy to covenants running with the land, or made directly to the consumer without contract. In some instances this theory has proved to be an unfortunate one. Although warranty was in its origin a matter of tort liability, and it is generally agreed that a tort action will still lie for its breach, it has become so identified in practice with a contract of sale between the plaintiff and the defendant that *the warranty theory has become something of an obstacle to the recognition of the strict liability where there is no such contract. There is nothing in this Section which would prevent any court from treating the rule stated as a matter of "warranty" to the user or consumer. But if this is*

*done, it should be recognized and understood that the "warranty" is a very different kind of warranty from those usually found in the sale of goods, and that it is not subject to the various contract rules which have grown up to surround such sales.*

The rule stated in this Section does not require any reliance on the part of the consumer upon the reputation, skill, or judgment of the seller who is to be held liable, nor any representation or undertaking on the part of that seller. The seller is strictly liable although, as is frequently the case, the consumer does not even know who he is at the time of consumption. The rule stated in this Section is not governed by the provisions of the Uniform Sales Act, or those of the Uniform Commercial Code, as to warranties; and it is not affected by limitations on the scope and content of warranties, or by limitation to "buyer" and "seller" in those statutes. Nor is the consumer required to give notice to the seller of his injury within a reasonable time after it occurs, as is provided by the Uniform Act. The consumer's cause of action does not depend upon the validity of his contract with the person from whom he acquires the product, and it is not affected by any disclaimer or other agreement whether it be between the seller and his immediate buyer, or attached to and accompanying the product into the consumer's hands. In short, "warranty" must be given a new and different meaning if it is used in connection with this Section. *It is much simpler to regard the liability here stated as merely one of strict liability in tort.*

(Emphasis added.)

constitute the content of the doctrine." 313 A.2d at 923 (emphasis in original).[10]

■ Strict liability has been adopted, either by judicial development of the common law, or by legislation, as a result of policy considerations that manufacturers, sellers and suppliers have a duty not to place defective, unreasonably dangerous products into the stream of commerce and that those who do so should be held responsible for injuries which thereafter occur as a result.[11] Strictly speaking, the doctrine is not an expansion of consensual warranty liability but sounds in tort. *See Greenman v. Yuba Power Products, Inc.,* 59 Cal.2d 57, 63, 377 P.2d 897, 901, 27 Cal.Rptr. 697, 701 (1962).

Moreover, we think our Legislature recognized this distinction when it enacted 14 M.R.S.A. § 221. The legislative provisions relating to "Defective or unreasonably dangerous goods" were originally proposed in 1973 as an additional section 2–318–A of our Uniform Commercial Code. L.D. No. 978, 106th Legislature. The Committee on Judiciary reported L.D. No. 978 as "Ought to Pass in New Draft." 2 Leg.Rec. 3381 (1973) (report of Committee on Judiciary). The "New Draft" (L.D.1963) took the provisions relating to "Defective or unreasonably dangerous goods" out of the Uniform Commercial Code entirely, enacting it instead as part of Title 14.[12]

The defendant has argued that to allow a products liability action to proceed against it would give "retroactive" or "retrospective" effect to 14 M.R.S.A. § 221. " 'Retroactivity' itself is 'a deceptively simple word for a complex set of problems.' " *Whipple v.*

---

**10.** In 1960 Dean Prosser, underscoring this essential distinction, wrote:

> All this [talk of contract] is pernicious and entirely unnecessary. No one doubts that, unless there is privity, liability to the consumer must be in tort and not in contract. There is no need to borrow a concept from the contract law of sales; and it is "only by some violent pounding and twisting" that "warranty" can be made to serve the purpose at all. Why talk of it? If there is to be strict liability in tort, declare it outright, without an illusory contract mask.

Prosser, *The Assault Upon the Citadel (Strict Liability To the Consumer),* 69 Yale L.J. 1099, 1134 (1960).

**11.** Legal literature has extensively documented and analyzed the development of strict liability. *See* Davis, *Product Liability Under Section 402A of the Restatement (Second) of Torts and the Model Uniform Product Liability Act,* 16 Wake Forest L.Rev. 513 (1980); Dickerson, *The ABC's of Products Liability—with a close look at Section 402A and the Code,* 36 Tenn.L.Rev. 439 (1969); Green, *Strict Liability Under Sections 402A and 402B: A Decade of Litigation,* 54 Tex.L.Rev. 1185 (1976); Keeton, *Meaning of Defect in Products Liability Law—A Review of Basic Principles,* 45 Mo.L.Rev. 579 (1980); Keeton, *Products Liability—Liability Without Fault and the Requirement of a Defect,* 41 Tex.L.Rev. 855 (1963); Prosser, *The Fall of the Citadel (Strict Liability to the Consumer)* 50 Minn.L. Rev. 791 (1966); Prosser, *The Assault Upon the Citadel (Strict Liability to the Consumer)* 69 Yale L.J. 1099 (1960); *Symposium, Products Liability,* 2 Hofstra L.Rev. 455 (1974); *Symposium, Products Liability Institute,* 10 Ind.L.Rev. 753 (1977); *Symposium, Products Liability,* 29 Mercer L.Rev. 373 (1978); *Symposium, Current*

*Developments in the Law of Torts,* 33 Vand.L. Rev. 551 (1980); Traynor, *The Ways and Meanings of Defective Products and Strict Liability,* 32 Tenn.L.Rev. 363 (1965); Wade, *On the Nature of Strict Tort Liability for Products,* 44 Miss.L.J. (1978). *See also* L. Frumer & M. Friedman, *Products Liability* § 16A (1981 and Supp.1981).

**12.** Our belief that the Legislature consciously recognized this distinction is further reenforced by the 1973 statutory amendments to 11 M.R. S.A. § 2–318 and to 14 M.R.S.A. § 161. P.L. 1973, ch. 441 (L.D.976). Between 1969 and 1973 11 M.R.S.A. § 2–318 provided in part that "lack of privity shall be no defense in any action brought against a manufacturer, seller or supplier to recover damages for breach of warranty . . . or *for negligence. . .*" (emphasis added), while 14 M.R.S.A. § 161 provided that "lack of privity shall be no defense in an action brought . . . *for breach of warranty* . . . or for negligence . . ." (emphasis added). *See* P.L. 1969, ch. 327. In 1973 the Legislature recognized the paradox of placing a statutory provision eliminating lack of privity as defense to a *tort* action in Article Two of the Uniform Commercial Code. In that year the Legislature made a clear distinction between warranty and tort claims by deleting from 14 M.R.S.A. § 161 all reference to actions based upon warranty and by deleting from 11 M.R.S.A. § 2–318 all reference to actions which are based upon negligence. P.L.1973, ch. 441. The statutory provisions which relate to the abolition of lack of privity as a defense to a *negligence* claim are now codified in section 161 of Title 14, which is also the Tit'e in which the Legislature chose to codify our strict liability statute.

*Howser,* 291 Or. 475, 488, 632 P.2d 782, 790 (1981) (Linde, J., concurring). The concept embraces legislative draftmanship and intent, policy considerations, rules of judicial presumptions and construction. When the application of legislation is truly retroactive the concept may involve constitutional issues.

> In real time, all laws can operate only prospectively, prescribing legal consequences after their enactment . . . . [A]ll new laws operate upon a state of affairs formed to some extent by past events. . . . Responsible attention to the significance to be attached to past events cannot be compressed into some simple formula. . . . The variety and sequence of relevant past events will be different in property law, in inheritance law, in commercial transactions, in taxation or public regulation, and in tort law, and so will the policy choices as to changing or preserving the preenactment legal effects of these past events.

*Id.* at 488, 632 P.2d at 790 (Linde, J., concurring). Thus, we look first to the intent of the Legislature as to the application of Section 221 and to the events it intended to be significant in the determination of legal consequences under Section 221.

P.L.1973, ch. 466, § 2 provided that "[t]his Act shall not be construed to affect *any cause of action arising prior to the effective date of this Act.*" (Emphasis added.) The inherent difficulty with Section 2, which governs the applicability of 14 M.R.S.A. § 221, arises because the Legislature drafted that section in a negative manner. Section 2 provides only a description of those actions to which Section 221 does *not* apply. It does not provide a statement as to what actions Section 221 does apply.

We realize that Section 221 by providing that "[o]ne who *sells* any goods or products in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused. . ." (emphasis added), does speak to the sale of goods or products. We think it erroneous, however, to describe the sale of goods as the operative event

upon which liability must stand or fall. The sale of goods or products by a seller simply establishes his status as "one who sells." The sale, in and of itself, however, creates only the potential for liability; it does not, without more, establish the liability of a seller. Actual liability is established only when "physical harm [is] thereby caused to a person." 14 M.R.S.A. § 221.

 As the foregoing discussion indicates, we reject, as we must, the contention that Section 221 does not apply merely because the sale of the allegedly defective, unreasonably dangerous product occurred prior to the effective date of the statute. Plaintiffs' cause of action did not arise prior to the effective date of Section 221 and is not precluded by the provisions of section 2. Moreover, a review of the legislation passed in 1973 by the One Hundred and Sixth Legislature, as well as our earlier determination that the Legislature recognized that a cause of action under Section 221 sounds in tort, leaves little doubt that the Legislature intended Section 221 to apply to causes of action such as the case at bar.

By P.L. 1973, ch. 442, § 1 the Legislature amended 11 M.R.S.A. § 2–725(2) to provide that "[a] cause of action for personal injuries under this Article for breach of warranty occurs when the injury takes place. . . ." The Statement of Fact accompanying this legislation (L.D. 977) states that "[t]he purpose of this bill is to conform the statute of limitations for personal injuries resulting from breach of warranty to the generally applicable statute of limitations for personal injury actions." The Legislature added a subsection 7 to 11 M.R.S.A. § 2–607 in that year to provide that notice is not required "where the remedy is for personal injury. . . ." P.L. 1973, ch. 443, § 1. The Statement of Fact to that legislation (L.D. 979) states that "[t]he purpose of this section is to provide that meritorious actions for personal injury shall not be defeated by the failure to give notice." We have recently had occasion to review at some length the 1973 legislation which added subsections (5) and (5)(a) to 11 M.R.S.A. § 2–316 to limit the effectiveness of at-

tempted exclusions or waivers of statutory warranties. *State ex rel. Tierney v. Ford Motor Co.*, Me., 436 A.2d 866, 871–874 (1981); *see* P.L.1973, ch. 444. Moreover, we noted in *Ford* that the 1973 Legislature also enacted significant amendments to the Maine Unfair Trade Practices Act, 5 M.R.S.A. §§ 206–14, "with a view toward enhancing consumer rights and remedies." 436 A.2d at 874; *see id.,* n.17; P.L. 1973, chs. 251, 320–23, 419.

As the preceding discussion of 1973 legislative activity indicates, the Legislature intended to enhance consumer rights and remedies, not only by amending the Maine UTPA, but also by amending Article 2 of the Uniform Commercial Code and enacting sections 161 and 221 of Title 14. Indeed, when discussing L.D. 1963, which when enacted, became 14 M.R.S.A. § 221—the very statute now in issue—the sponsor of that legislation commented "[t]his legislature is, we all hope, going to become the legislative legislature that is going to enact some significant reform, and I think we have already done a lot of things in the area of consumer protection." 3 Leg.Rec. 3897 (1973) (remarks of Sen. Richardson).

We held in *Williams v. Ford Motor Company* that a cause of action in tort arises or accrues at that point "when the *particular* potential plaintiff has a judicially recognizable claim against the defendant." 342 A.2d at 718 (emphasis in original). Our legislative review leaves little doubt that the Legislature intended the rules generally applicable to actions which sound in tort to apply to actions brought pursuant to 14 M.R.S.A. § 221. We must here apply our strict liability statute in the manner our Legislature intended it to be applied. *Cf. Forrest City Machine Works, Inc. v. Aderhold,* —— Ark. ——, 616 S.W.2d 720 (1981) (applying 1973 statutory adoption of strict liability to cause of action alleging injury occurring in 1977 caused by product manufactured in 1956). We determine, therefore, that the Legislature intended that under the circumstances here alleged these plaintiffs could avail themselves of the provisions of 14 M.R.S.A. § 221.

By so holding, we reject the defendant's contention that to allow the plaintiffs to avail themselves of the provisions of Section 221 would, in effect, constitute an impermissible retrospective application of the statute. When a new law invades the province of vested rights its application may be termed retrospective. Here, however, we discern no such intrusion.

We are aware that by allowing these plaintiffs to pursue their strict liability claim, Section 221 will affect a state of affairs created to some extent by events which occurred prior to the injury, and, indeed, prior to the effective date of the Act. This, by itself, however, need not require the application of Section 221 to be characterized as a retrospective application. All new laws, when applied, are applied to a state of affairs created by past events. *See Whipple v. Howser,* 291 Or. at 488, 632 P.2d at 790 (Linde, J., concurring); text *supra* at 942. Courts must examine the state of affairs which has been determined by past events to consider the character of previously established rights, expectations and prospects which will be displaced. They must, at the same time, consider the manner in which the Legislature intended the enactment to apply with a realization that legislation which readjusts "rights and burdens is not unlawful merely because it upsets otherwise settled expectations. This is true even though the effect of the legislation is to impose a new duty or liability based on past acts." *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 16, 96 S.Ct. 2882, 2893, 49 L.Ed.2d 752, 767 (1976) (citations omitted).[13]

In products liability, the design, manufacture and sale of a defective, unreasonably

---

13. In *Usery* the Court rejected a Due Process attack on the application of the Black Lung Benefits Act of 1972, 30 U.S.C. § 901 *et seq.* (1970 ed. and Supp.IV), to employees who ceased work in the coal-mining industry before the enactment of the act on the ground that the act impermissibly charged mine operators "with an unexpected liability for past, completed acts that were legally proper and, at least in part, unknown to be dangerous at the time." 428 U.S. at 15, 96 S.Ct. at 2892, 49 L.Ed.2d at 766.

dangerous product are events which rarely coincide, and, more often than not, diverge from the occurrence of the injury. In seeking to provide a remedy for persons injured by defective, unreasonably dangerous products placed in the stream of commerce the Legislature could rationally and properly intend the occurrence of an injury to be the event to give an injured party the right to a judicially recognizable claim. Here, the injury Sheldon Adams suffered on July 13, 1979 occurred long after the enactment of 14 M.R.S.A. § 221. Because it was the injury which the Legislature could and did intend to constitute the event which would provide a person injured by a defective, unreasonably dangerous product with a judicially recognizable claim, we conclude that application of Section 221 in this context is a prospective application and permissible.[14]

We need decide at this time only that the Superior Court erred when it granted the defendant's motion for summary judgment. At trial the plaintiffs must, of course, sustain their burden of proving the requisite elements of negligence to prevail upon their negligence claim. In addition, in order to establish the liability of the defendant under 14 M.R.S.A. § 221 the plaintiffs must prove at trial the requisite elements there prescribed.

The entry is:

Judgment vacated.

Remanded to the Superior Court for further proceedings consistent with the opinion herein.

GODFREY, NICHOLS, CARTER, VIOLETTE and WATHEN, JJ., concurring.

GODFREY, Justice, with whom CARTER, J., joins, concurring.

I have no doubt of the correctness of the Court's decision as a matter of substantive law. My only serious question relates to the applicability of the doctrine of precedent, or *stare decisis*.

It is an essential element of the doctrine of precedent that pronouncements by the Court have binding effect only when they are necessary to the decision of the specific case before the Court.

*Hurd v. Hurd*, Me., 423 A.2d 960 (1981), creates no real problem, for it was not necessary in order to reach the result in that case to *hold* that the privity requirement was an element of the products liability tort law of Maine before the 1969 statute became effective. As Justice Glassman pointed out in his concurring opinion in *Hurd*, 423 A.2d at 965–66, the decision of the trial court could have been easily affirmed on the basis of the trial court's finding that plaintiff had failed to prove that the defendant manufacturer had been negligent.

*Burke v. Hamilton Beach*, Me., 424 A.2d 145 (1981), is another matter. Although the observations of the Court in that case on the purport of 14 M.R.S.A. § 221 were dictum, the rationale of the case—that privity had been a requirement of Maine products liability tort law before 1969—was a pronouncement necessary for support of the decision. *Burke* was thus authoritative as a precedent on that point. If there were any possibility that, during the months since *Burke* was decided, reliance could have been placed on that decision by government administrators or by private law-makers in planning transactions or drafting documents or instruments, I would feel obliged, though reluctantly, to follow that case as binding precedent. In the absence of any possibility that such reliance interests could have developed, I regard the decision in *Burke* as so unjust that the doctrine of precedent must yield to the interest of correcting a serious mistake.

---

14. We thus reject the proposition advanced by way of dictum in *Burke*, 424 A.2d at 148 n.6, that the limitation of applicability contained in P.L.1973, ch. 466, § 2 must be read in *pari materia* with the limitation provisions of the 1963 and 1969 Uniform Commercial Code legislation. *See* P.L.1969, ch. 327, § 3; P.L.1963, ch. 362, § 41.

My non-concurrence in *Burke*, my separate concurrence with Justice Glassman in *Hurd*, and my concurrence in the present decision all stem from a persisting willingness to indulge a presumption that if the Law Court had been squarely presented a generation ago with the issue of the necessity of privity in tort actions, its decision would have accorded with the great weight of American cases and scholarly writings and with good sense. To ascribe the contrary, idiosyncratic view to the Law Court of those days on the basis of a few old ambiguous dicta fails to do it justice. Moreover, I do not think that the Legislature was ascribing such a view to the Court either. I find nothing in the 1969 or 1973 statutes that is inconsistent with an appreciation on the part of the Legislature that the Court had not yet ruled on the issue.

McKUSICK, Chief Justice, dissenting.

I would affirm the judgment of the Superior Court on the authority of *Burke v. Hamilton Beach Division*, Me., 424 A.2d 145 (1981), and *Hurd v. Hurd*, Me., 423 A.2d 960 (1981).